UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                           **REPORT, RECOMMENDATION**
                                                    **and ORDER**
v.

DIJON HARRIS,                                       14-CR-00177-RJA-JJM

                          Defendant.
_____


          Defendant Dijon Harris is charged in a four-count Indictment with possession of

heroin with intent to distribute, in violation of 21 U.S.C. §841(a)(1), maintaining a drug-involved

premises, in violation of 21 U.S.C. §856(a)(1), and firearm offenses.  Indictment [1].[1] The

charges against defendant arise from the September 5, 2014 execution of a search warrant issued

by New York State Supreme Court Justice Timothy Drury for defendant's residence at 335

Hewitt Avenue, in Buffalo, New York.  The warrant was supported by the *in camera* testimony

of a confidential source ("CS").

          Before me are defendant's remaining[2] pretrial motions [17, 25, 31,[3] 53, 93,

123][4] and the government's cross-motion for reciprocal discovery.  Government's Response

[33], p. 19, ¶J.  An evidentiary hearing concerning defendant's motion to suppress his September

_____

[1]        Bracketed references are to the CM/ECF docket entries.

[2]        In my March 21, 2016 Report, Recommendation and Order [65], I previously addressed
defendant's motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) ([53], ¶4) and for
disclosure of certain redacted portions of the CS's testimony [39].  At defendant's request, those motions
were addressed preliminarily to facilitate a possible pretrial resolution of this action.  Id., p. 1, n. 2.  I later
denied defendant's motion ([93], ¶¶16-58) for reconsideration (December 19, 2016 Text Order [100]) and
objections to my Report, Recommendation and Order [65] remain pending.  See [69, 101].

[3]        A redacted version of the motion is docketed at [30].

[4]        Defendant has had a number of attorneys, which in turn has resulted in successive motions.

5, 2014 statements (Blotnik Affirmation [17], ¶¶29-32; Humann Affirmation [25], ¶¶29-32)  was

held on February 8 [117], March 8 [114], and April 13, 2017 [128], at which Erie County

Sheriff's Office Detectives Alan Rozansky, Daniel Granville, Warren Hawthorn, and Adam

Imiolo[5] testified for the government, and defendant and his step-daughter, Shawnda Jackson,

testified for the defense.  Thereafter, the parties submitted post-hearing briefs [133, 134, 137,

139] and oral argument was held on August 10, 2017 [142].   For the following reasons, I

recommend that defendant's dispositive motions be denied; and I further order that his non-

dispositive motions be granted in part and denied in part, and that the government's cross-motion

be granted.

## BACKGROUND

While there is some agreement as to the events of September 5, 2014, as set forth

below, the parties' versions of events diverge in material respects.

### The Government's Version of Events

At approximately 4:30 p.m. on September 5, 2014, seven or eight law

enforcement officers comprised of members of the Erie County Sheriff's Office and the City of

Buffalo Police Department conducted a no-knock entry into defendant's residence pursuant to

the search warrant for 335 Hewitt Avenue. February 8, 2017 transcript [117], pp. 24, 46, 89, 122.

At the time, defendant and approximately five other individuals were present in the residence.

Id., pp. 46, 132.  The officers had their guns drawn and some of the undercover officers were

wearing black masks to protect their identities. Id., pp. 88-89, 93, 160.  Another six or seven

officers remained on the perimeter. Id., pp. 46, 89.

---

[5]        Detective Imiolo testified in rebuttal.

Upon their entry into the residence, defendant fled into a rear bedroom, where he was placed into custody following a brief five-second struggle with Detectives Hawthorn and Timothy Donovan to prevent him from gaining access to a knife. Id., pp. 94-95, 131, 133-36. The other individuals in the residence were handcuffed. Id., p. 154.

Detective Hawthorn advised defendant of his Miranda rights[6] from memory before he was questioned  Id., pp. 97 137.  He testified that he told defendant "You have the right to remain silent, Anything you say can and will be used against you in a court of law. You have the right to an attorney. If for some reason you can't afford an attorney one will be provided for you by us".  Id., p. 137.  Thereafter, he asked defendant if he understood his rights.  Id., p. 137. Although Detective Granville could not recall how defendant expressed it, he testified that defendant responded affirmatively. Id.  Defendant was interviewed at 4:40 p.m. by Detective Hawthorn for approximately five to ten minutes in the rear bedroom while the search of the residence continued. Id., pp. 53, 54, 138-39, 141, 146.  Detective Hawthorn testified that defendant was cooperative, cordial, alert, lucid and responsive during the interview. Id., pp. 146-48.  He denied that defendant appeared to be sleepy, under the influence of drugs or alcohol, or "dope sick" (i.e, experiencing heroin withdrawal).  Id., pp. 149-50.  Defendant also did not request a lawyer or ask to stop the interview. Id., p. 151. That interview was memorialized shortly thereafter in a N.Y. Crim P. Law ("CPL") §730.10 form prepared by Detective Hawthorn.  Id., pp. 138-39; gov. ex. 1 [126-1].

During that interview, Detective Granville asked if defendant wanted to cooperate.  [117], p. 70. No threats or promises were made in connection with that request.  Id., pp. 101, 148-49. Because defendant indicated that he wanted to cooperate, Detectives Granville

---

[6]    Miranda v. Arizona, 384 U.S. 436, 479 (1966).

and Donovan transported him to the precinct at 45 Elm Street in Buffalo shortly before 5:00 p.m. to prevent the other individuals present in the residence from hearing their conversation. Id., pp. 50-51, 54-55, 70, 98, 122. Firearms, controlled substances, drug paraphernalia, and currency were recovered during the search. Id., pp. 51-52; gov. ex. 8 [126-12].

Detective Granville could not recall the substance of the conversation he and Detective Donovan had with defendant during the 10 to 12 minute ride to the precinct. [117], p. 79. When they arrived at the precinct, defendant was taken to a "very small" interview room with a desk and several chairs on the first floor, where he remained for 15 to 20 minutes before the detectives began speaking with him. Id., pp. 14, 16, 57.

The videotaped interview[7] was conducted by Detective Granville and Detective Donovan was present. Id., p. 59. Defendant remained handcuffed during the interview. Id., p. 58. Detective Granville testified that no promises or threats were made to defendant prior to the commencement of the videotaped interview. Id., pp. 65-66. Detective Granville acknowledged that at the outset of the approximately 18 minute interview[8], defendant was not responsive to being asked if he wanted coffee. Id., pp. 106-07. Defendant was initially asked pedigree questions before stating "I'm fuc**** finished man. (God?) help me man". Gov. ex. 7B [126-11], p. 1 of 14. At that point, defendant was read his Miranda rights and then told to read the Statement of Rights and Waiver (gov. ex. 6 [126-10]) to himself and to put a "Y" and his initials after each right if he understood them. [117], p. 122; gov. ex. 7B [126-11], pp. 1-2 of 14. Defendant was provided with coffee and acknowledged that he had previously cooperated with authorities. Gov. ex. 7B [126-11], pp. 1-4. During the course of the interview, defendant

---

[7]     The video camera is partially obscured by the open door of the interview room.

[8]     The interview has been transcribed. Gov. ex. 7B [126-11].

conceded that he used a gram of heroin per day, and was "tired . . . so tired" from partying the

night before. [117], p. 86; gov. ex. 7B [126-11], pp. 3-4, 10 of 14.   Detective Granville testified

that defendant appeared to be under the influence of drugs or alcohol, to be "dope sick", and to

be sleepy during the interview. [117], pp. 85-86, 109, 127.  However, he did not believe that

defendant required medical treatment.  Id., p. 110.  Defendant never spoke in an agitated manner,

never appeared distracted, did not require assistance walking, made appropriate eye contact, and

followed instructions. Id., pp. 86-87.

       During the interview defendant stated "Is there anything you can do to help me?  I

need some fuc**** help or I'm fuc***", to which Detective Granville responded "But we can't

help you.  You got to help yourself.  You know what I mean man. . . . You got to be able to do

something. You know how this works.  You know our boss has got to see". Gov. ex. 7B [126-

11], p. 11 of 14.  After informing defendant that they wanted him to identify certain drug houses

that he had mentioned during the interview in order to obtain search warrants for those premises,

the videotaped interview ceased and they left in a police vehicle for that purpose. [117], pp. 78,

80-81, 117; gov. ex. 7B [126-11], pp. 13-14. Although Detective Granville took notes during the

interview, he no longer had them at the time of the hearing, stating that they may have been lost

or thrown out by mistake.  [117], pp. 91-92. Detective Granville estimated that he interacted

with defendant for a couple of hours from the time of the search warrant execution through his

arrest processing.  Id., p. 84.

       Although not captured on the videotape, Detective Rozansky, who was not

present during the interview, testified that approximately 15 to 30 minutes after defendant

arrived at the precinct, consistent with his standard practice he entered the interview room, which

was located near his office, to offer defendant water and make sure he was okay.  Id., pp. 17, 28-

29, 31-32, 37. In response to his inquiry, defendant spontaneously made a "[p]assionate plea to help him . . . he was willing to cooperate". Id., pp. 18, 23. Detective Rozansky did not know if this occurred before or after the videotaped interview. Id., pp. 31-32. The entire encounter lasted five minutes or less and Detective Rozansky later recorded defendant's statement on a CPL §710.30 form. Id., p. 36; gov. ex. 4 [126-8]. Detective Rozansky testified that defendant was "articulate [and] emotional". Id., p. 23. During their short encounter, defendant did not appear to him to be incoherent, sleepy, or high on drugs, and did not request a lawyer. Id., pp. 23-24. When asked if someone would have made a subjective decision to only record a portion of the interview, Detective Rozansky testified "[w]e wouldn't pick and choose. If someone went in there to interview him and they turned it on, and when they were done they turned it off". Id., p. 31. Although he did not think that defendant was in the interview room for several hours, he believed that he was there for more than 30 minutes. Id., p. 29.

During the approximately 20 minute ride following the conclusion of the interview, the detectives discussed with defendant his source of supply and the residences from where he purchased heroin. Id., pp. 51, 78-79, 83. Detective Granville testified that no promises or threats were made to defendant during the ride. Id., pp. 81-83. He also testified that defendant remained cooperative, was lucid, and did not appear confused at any point during the encounter. Id., p. 84. He never asked for a lawyer or for the interview to cease. Id., pp. 86-87. Nor did he complain about the officers entering his residence with guns and masks, or about the way his family members were treated during the execution of the search warrant. Id., p. 124.

### Defendant's Version of Events

Defendant testified that he was in the back bedroom at the time the search warranted was executed.  March 8, 2017 hearing transcript [114], p. 71.  Because the officers were wearing masks, he believed that he was being robbed.  Id., pp. 71-72.  Defendant was told to get on the floor and was struck in the face by Detective Donovan without provocation.  Id., pp. 72, 89-90, 92.  Detectives Donovan and Rozansky, as well as a few other officers, began asking him questions while he was handcuffed in the bedroom without reading him his Miranda rights.  Id., pp. 73-74.  Defendant spent two to three minutes in the back bedroom before being brought out to the kitchen area, where he could see his family.  Id., pp. 74-76.  He was then "pushed back inside the hallway area", where he stood for about two or three minutes before deciding to cooperate.  Id., p. 76.  His decision to cooperate was motivated by law enforcement's threat that if he did not cooperate, his family was going to be locked up.  Id., p. 74.  Defendant left the house shortly thereafter with Detectives Donovan and Hawthorn, who took him in a van with tinted windows to various locations in Buffalo asking him if he knew anyone in the last ten days that sold drugs.  Id., p. 77.

After about an hour he was taken to the precinct, where he was placed in an interview room for approximately four to five hours and questioned by three or four officers, including Detectives Granville and Rozansky  Id., pp. 77-78.  Defendant testified that the videotaped portion of the interview only captured the end of the interview, and that he was questioned for two to three hours before he was first read his Miranda rights as depicted in the videotape.  Id., pp. 78-79.  He continued to answer questions after being read his Miranda rights because he was told, "if I was cooperate . . . I may not be charged . . . and they're not gonna charge my family for some stuff that they supposedly had found".  Id., p. 79.

The night before his arrest, defendant did not sleep and was intoxicated from using heroin shortly before the search warrant was executed.  Id., pp. 80-81, 86.  Defendant explained that heroin "takes approximately 20 [minutes], maybe an hour before it start[s] to make you nod. . . . sleepy, in a comatose type state".  Id., p. 105.  The heroin he took did not take "its full effect" until he arrived at the precinct. Id.  Because he was intoxicated, defendant did not recall initialing the Miranda waiver (gov. ex. 6. [126-10]) and could not remember everything.  [114], pp. 106, 108.  After the interview, he was taken directly to Erie County Holding Center and placed  into detox.  Id., pp. 79-81.

Ms. Jackson, who was present at defendant's residence at the time of the execution of the search warrant, testified that the officers that entered the residence were not dressed in uniforms and that one of the officers held a gun to the head of her 14 year-old brother while his hands were in the air.  Id., pp. 9, 13, 45.  She also observed her brother crying and being threatened to "answer the questions because we could take you to foster care", but at that point defendant was in the back bedroom with the agents and the door to that room was shut. Id., pp. 20-21, 24-25. She further heard her sister Tisa, who was eight months pregnant at the time, scream from the other room  "you don't have to kick me, I'm already down".  Id., p. 14.

When defendant exited the back bedroom, Ms. Jackson  made eye contact with him and he appeared upset, asking "please, get my daughter out of the handcuffs, please, just get her out of the handcuffs and that's when they pushed him back into the room or back into the back area".  Id., p. 15.  When they were pushing him back, she heard the officers tell defendant "corroborate or we're taking everyone to jail".  Id., pp. 18-19, 29, 46, 48.[9] At that time she was

---

[9]    Ms. Jackson confirmed that the officers said corroborate, rather than cooperate, but testified that she understood corroborate to mean "do what we tell you to do".  [114], pp. 66-67.

in the living room. Id., pp. 46-47.  She next saw defendant when he was being led out through the back door.  Id., p. 29.

Defendant had picked up Ms. Jackson from the bus station that morning, hours before the search was executed. Id., pp. 35, 42.   She did not observe defendant drinking or using controlled substances.  Id., p. 42.  Nor did she not see her father struggling to stand or to stay awake. Id., p. 43.  He also did not mention that he was exhausted. Id.

## ANALYSIS

### A.    Defendant's Motions

#### 1.    Motion to Suppress Statements

Defendant argues that 1) the "statements at 335 Hewitt [and all subsequent statements] should be suppressed because the Government failed to meet its burden of establishing that the accused was afforded his Miranda warnings in a custodial situation" (defendant's Post Hearing Memorandum [133], p. 34); and that 2) "[a]ll statements [, including those at 335 Hewitt Avenue and that the precinct,] should be suppressed because they were not voluntarily made". Id., p. 35.

#### a.    Evidentiary Issues

Before turning to the merits of the parties' arguments, defendant challenges the government's use of certain alleged  impeachment evidence, including evidence seized from his 2011 Lincoln MKX on September 5, 2014 (gov. exs. 11-12; defendant's Post Hearing Memorandum [133], pp. 27-28),  two recordings of jail conversations between him and family

members (gov. exs. 14T-1 and -2; defendant's Post Hearing Memorandum [133], pp. 28-29); and the rebuttal testimony of Detective Imiolo.  April 12, 2017 hearing transcript [128], pp. 18-44; defendant's Post Hearing Memorandum [133], pp. 31-34.  However, it unnecessary for me to resolve these issues since, for the reasons discussed below, even without any of that evidence or testimony, I credit the testimony of the government's witnesses over that of the defense witnesses.  Therefore, defendant's motion for a ruling on these evidentiary issues [123] is denied as moot.

### b.     Credibility

Since the testimony of the government's and defense witnesses differ in certain material respects, "this case turns, as many do, on the issue of credibility".  United States v. Bayless, 921 F.Supp. 211, 213 (S.D.N.Y. 1996).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is 'entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness.'"  Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).  An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony".  Diallo v. I.N.S., 232 F.3d 279, 287 88 (2d Cir. 2000).

Having observed the witnesses' demeanor and considered the substance of their testimony, I find the government's witnesses to be more credible than the defense witnesses.  In reaching that conclusion, I am influenced by the fact that if defendant had been struck in the face without provocation,  threatened into cooperating, and then questioned for two to three hours thereafter at the precinct without being Mirandized (as he testified to at the hearing), I would

-10-

have expected those facts to appear in his initial Affidavit submitted in support of his

suppression motion [25-1]. Instead, that Affidavit merely stated that he was questioned at his

home without being Mirandized. Id., ¶¶4-5. His failure to initially mention those significant

facts is inexplicable.

        I also find defendant's testimony that the videotape of the interview only depicted

the end of a two to three hour interview to be improbable. [114], pp. 78-79.  If that were so,

there would have been no reason for Detective Granville to introduce himself to defendant or to

say to defendant "*[b]efore we have a conversation*, I got to give you your rights"  – as occurs on

the videotape. *See* Gov. ex. 7B, pp. 1, 3 of 14 (emphasis added).  Presumably, defendant – even

in an incapacitated state – would have expressed some confusion as to these statements, had he

already sat through an hours-long interview with Detective Granville.

        Moreover, as the government noted at oral argument, had law enforcement

intended to "cherry pick" a favorable portion of the interview to videotape as defendant alleges,

it is unlikely that it would have chosen the segment it did, which depicts defendant as being

initially groggy.  Defendant's version of events is also belied by the Miranda waiver, which was

executed by Detective Granville at 5:15 p.m. Gov. ex. 6 [126-10].  Therefore, where their

testimony conflicts, I have credited the government's witnesses (whom were generally consistent

both internally and *vis-à-vis* each other) over that of the defense witnesses.


      c.    **Miranda**

        To establish a valid Miranda waiver, the government must demonstrate

by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was

voluntary, and (2) that the defendant had a full awareness of the right being waived and of the

consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995);

Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Gonzalez, 764 F.3d 159, 166

(2d Cir. 2014).


### i.    The Interrogation at Defendant's Residence

Defendant argues that the government has not met its burden of

establishing that he was properly Mirandized before being interrogated at his residence.

Defendant's Post Hearing Memorandum [133], pp. 16-18, 20-22.  He contends that the "[t]he

Court is in the dark about what it was that [he] was told".  Id., p. 18.

"Some courts have found that absent specific testimony as to the content of the

warnings given or the admission into evidence of the pre-printed Miranda card used by the

officer in administering warnings, the government fails to meet its burden."  United States v.

Seldinas, 2015 WL 1823532, at *5 (W.D.N.Y. 2015) (Arcara, J.). This is not such a case.

Detective Hawthorn credibly testified that he advised defendant of his Miranda rights from

memory by stating:  "You have the right to remain silent, Anything you say can and will be used

against you in a court of law. You have the right to an attorney.  If for some reason you can't

afford an attorney one will be provided for you by us".  [117], p. 137.

The fact that Detective Hawthorn recited the Miranda warnings by memory does

not, standing alone, undermine the sufficiency of the warnings. See United States v. Lerma, 2002

WL 31548076, *2 (D. Minn. 2002) ("[t]he only evidence regarding this Miranda warning is

Payne's testimony that he delivered it from memory. The Court finds this fact inadequate to call

the warning's sufficiency into question").  In arguing that the warnings given were inadequate,

plaintiff points to the fact that "[h]e was not advised that he had the right to NOT answer police

questions. He was not advised that he had the right to stop answering questions so he could consult with an attorney. He was not advised that his right to an attorney started before he spoke with the police. He was not advised that he had the right to have an attorney present during police questioning, and he was not advised that if he could not afford an attorney that one would be appointed by the Court." Defendant's Post Hearing Memorandum [133], p. 21. He further argues that Detective Hawthorn's use of the word "us" in describing who would provide an attorney made it doubtful that he had any "confidence that a police attorney would have been of much assistance to him". Id.

Miranda requires that an individual "must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires". Miranda, 384 U.S. at 479. However, that precise recitation of the four rights is not required. See Florida v. Powell, 559 U.S. 50, 60 (2010). "The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda". Id.

The warnings given by Detective Hawthorn satisfy that standard. Contrary to defendant's argument, there is no requirement that the warning of a general right to counsel include "any express reference to the right to counsel during interrogation". United States v. Warren, 642 F.3d 182, 186 (3d Cir. 2011); United States v. Fields, 2016 WL 1428113, *4 (E.D. Pa. 2016). Nor is there anything "in Miranda which requires a statement that one who answers questions has the right to stop doing so". United States v. Alba, 732 F.Supp. 306, 310 (D.Conn.1990); United States v. Lares-Valdez, 939 F.2d 688, 689 (9th Cir. 1991) ("a defendant need not be informed of a right to stop questioning after it has begun"). I further conclude that

Detective Hawthorn's statement that "[i]f for some reason you can't afford an attorney one will be provided for you by us" ([117], p. 137) sufficiently conveyed to defendant the right set forth in Miranda that if he could not afford an attorney, one would be appointed for him prior to any questioning. *See generally*, Tiedemann v. Bigelow, 2012 WL 4584492, *4 (D. Utah  2012) (finding a valid waiver of Miranda rights, where the defendant was advised "[i]f you cannot afford an attorney, we will provide one for you").

### ii.     Interrogation at the Precinct[10]

As acknowledged by defendant, "[s]tatements made to police while the speaker is intoxicated or under the influence of drugs or alcohol are not *per se* involuntary".  United States v. Maldonado, 2012 WL 826998, *4 (W.D.N.Y.), adopted, 2012 WL 827033 (W.D.N.Y. 2012); defendant's Reply [137], p. 2 of 8. "Rather, the court must evaluate whether the defendant understood his rights and knowingly waived them." Maldonado, 2012 WL 826998, *4

Defendant argues that the videotape of the interview demonstrates that his acknowledgement that he understood his Miranda rights "consisted of something less than a grunt" and that his writing of the letter "Y" (for yes) on the Miranda waiver is "consistent with [him] merely doing what he was told to do: Write a 'Y' here".  Defendant's Post Hearing Memorandum [133], p. 10.  The videotape of the interview demonstrates that defendant merely nodded when read his Miranda rights and asked if he understood them. Gov. ex. 7B [126-11], p. 1 of 14.  However, it also shows that he was then asked to read  each of the Miranda rights and

---

[10]     While defendant states that he is only challenging the sufficiency of the Miranda warnings that were given at his residence (defendant's Post Hearing Memorandum [133], p. 34), his arguments also appear to challenge the sufficiency of the Miranda waiver he gave at the precinct.

repeatedly advised  to put a "Y" and his initials after each right *if he understood them*.  Id., p. 2 of 14.[11]

After acknowledging that he understood his <u>Miranda</u> rights, defendant was asked by Detective Granville whether he had previously cooperated with law enforcement. *See* gov. ex. 7B [126-11], pp. 2-4 of 14.  The interview continued from there in a conversational tone without defendant demonstrating any hesitation about speaking with Detective Granville or giving any indication that he wished to invoke his right to remain silent. While the videotape of the interview depicts that defendant was initially groggy, his responses to Detective Granville's questions were appropriate.  Therefore, I conclude that the government has satisfied its burden of establishing by a preponderance of the evidence that defendant knowingly and voluntarily waived his <u>Miranda</u> rights, and recommend that this portion of defendant's motion be denied.

### d.    Voluntariness

"[T]he prosecution must prove by at least a preponderance of the evidence that the confession was voluntary".  <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972). "A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne."  <u>United States v. Connelly</u>, 2007 WL 3124538, *8 (W.D.N.Y. 2007). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful

---

[11]    Although defendant was not asked to complete the balance of the <u>Miranda</u> waiver or whether he was willing to waive those rights (*see* gov. ex. 6 [126-10]), "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived" his <u>Miranda</u> rights.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 375–76 (1979).  A valid waiver may be inferred from "silence, coupled with an understanding of [the defendant's] rights and a course of conduct indicating waiver".  <u>Id.</u> at  373.

evaluation of the totality of the surrounding circumstances." Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988).

"In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Id. at 901-02. "[A] single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." Id. at 902.

As discussed above, defendant acknowledges that "intoxication does not, in and of itself, render a statement involuntary". Defendant's Reply [137], p. 2 of 8. "[A] defendant's mental condition, by itself and apart from its relation to official coercion" does not "dispose of the inquiry into constitutional 'voluntariness'". Colorado v. Connelly, 479 U.S. 157, 164 (1986). It remains that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment". Id. at 167. "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." United States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998).

Crediting the testimony of the government's witnesses and having observed the videotape of the interview, I conclude that while defendant was plainly incapacitated to some degree (whether by lack of sleep, use of heroin, withdrawal, or some combination thereof), he was sufficiently alert, responsive, and cogent. Even considering his diminished mental state, neither the conditions of the interrogation nor law enforcement's conduct were sufficiently

coercive so as to render his statements involuntary. The only physical interaction with law enforcement occurred when they initially encountered defendant to prevent him from reaching a nearby knife. [117], p. 133. However, that was only a brief struggle, lasting approximately five seconds, with limited resistance. Id., p. 134. Defendant testified that members of his family were handcuffed and on the floor and appeared afraid, but also testified that Ms. Jackson told him that she was okay. [114], pp. 75-76. Significantly, defendant never testified that he observed any of the mistreatment that Ms. Jackson described or complained of any mistreatment (to himself or his family) during the videotaped interview. As demonstrated on the videotape, no promises or threats were made to defendant, and the entire interview proceeded in a conversational tone. Likewise, I credit the testimony of Detectives Granville and Hawthorn that no promises or threats were made at any other point of the encounter and that defendant was similarly "cordial and cooperative" when he was interviewed at his residence. [117], pp. 65-66, 101, 146, 148-49. Therefore, I conclude that the government has established by a preponderance of the evidence that defendant's statements were voluntary, and recommend that this portion of defendant's motion be denied.

2.      **Motion to Suppress Evidence Seized Pursuant to the Search Warrant for 335 Hewitt Avenue**

a.      **Reliability of the Confidential Source ("CS")**

In seeking suppression of the evidence seized pursuant to the search warrant for 335 Hewitt Avenue, defendant argues that "[w]hile the affidavit for the search warrant indicates that the informant was 'reliable' no information was set forth to establish the reliability of the informant". Blotnik Affirmation [17], ¶24; Humann Affirmation [25], ¶24; Cantwell Affirmation [53], ¶2. While that is true, as set forth in my March 21, 2016 Report, Recommendation and

Order [65] addressing defendant's motion for a <u>Franks</u> hearing, Judge Drury had a full

opportunity to make his own assessment of the CS's reliability:

> "The CS 'appeared before Judge Drury, Judge Drury questioned [her/him]
> under oath and therefore, Judge Drury was able to make his own, independent
> determination as to the reliability of the information supplied by the [CS]'.
> <u>United States v. Glover</u>, 2010 WL 3608045, *6 (W.D.N.Y. 2010) . . . . Detective
> Donovan also corroborated at least some of the CS's information by having the CS
> identify [defendant] from a booking photograph and identify 335 Hewitt Avenue during a
> drive-by. Donovan Affidavit [17], ¶2(a). He also testified that the CS's description of
> there being an off-white block of heroin at Hewitt's residence was credible and
> consistent with the CS's understanding that [defendant] was receiving heroin from New
> York City. Redacted transcript [51-1], pp. 5, 10." <u>Id</u>., p. 5.

For these reasons, I likewise recommend that this motion be denied.


### b.    Execution of the Search by Law Enforcement Not Specified in the Warrant

Defendant argues that although the search warrant for 335 Hewitt Avenue only

permitted the Erie County Sheriff's Office to conduct the search, law enforcement members not

affiliated with the Erie County Sheriff's Office were among those that executed the search

warrant.   Blotnik Affirmation [17], ¶17; Humann Affirmations [17], ¶17, [31], ¶7; defendant's

Post Hearing Memorandum [133], pp. 29-31, ¶G.  In response, the government does not dispute

that City of Buffalo Police detectives participated in the search, but argues that "[l]aw

enforcement officers to whom a search warrant is addressed may avail themselves of third-party

assistance".  Government's Supplemental Response [37], pp. 1-3.

I agree with the government. "[T]he presence of a third party who is assisting

authorized officers in their search does not violate the Fourth Amendment's reasonableness

requirement." <u>Mason v. Barbieri</u>, 338 Fed. App'x. 94, 95–96 (2d Cir. 2009) (Summary Order).

<u>People v. Barfield</u>, 151 Misc. 2d 1031, 1032-33 (Suffolk Cty. Ct. 1991) (suppression denied

where the search warrant was directed to the Suffolk County Police Department, but was executed solely by the New York State Police).

Defendant's reliance on People v. Cipolla, 168 Misc. 2d 375 (Westchester Co. Ct. 1995) does not compel a different conclusion. Defendant's Post Hearing Memorandum [133], p. 30. There, the court addressed the distinct question of "whether Federal agents may lawfully search a premises upon the authority of a valid State search warrant issued in connection with another criminal transaction and directed to 'any member of the New York State Police,' where the Federal agents are investigating an unrelated criminal transaction, and have probable cause and time to obtain a separate Federal warrant." Cipolla, 168 Misc.2d at 381. No such circumstances are presented here. Therefore, I recommend that this motion be denied.

### c. Seizure of Firearms

Defendant argues that there was no basis for the seizure of the firearms from the second floor bedroom closet, since the search warrant authorized a search for drugs, which were recovered from the first floor rear bedroom, the firearms were not in plain view. Humann Affirmation [31], ¶¶2-12; defendant's Post Hearing Memorandum [133], p. 29, ¶G. He seeks a hearing on this issue. Defendant's Post Hearing Memorandum [133], p. 29, ¶G. In response, the government contends that the firearms were properly seized, since they are contraband and were secreted in a location where the drugs could have been located. Government's Response [33], pp. 10-12.

I agree with the government. It is well settled that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found . . . . Thus, a warrant that authorizes an officer to search a home for [an] illegal [item] also provides

authority to open closets, chests, drawers, and containers in which the [item] might be found."
United States v. Ross, 456 U.S. 798, 820–21 (1982).  Significantly, defendant does not argue that
that the search warrant did not permit a search of the second floor.  Nor does he argue that the
firearms, which he concedes were located in the upstairs closet (Humann Affirmation [31], ¶2),
were in a location where drugs could not be located.

Since law enforcement's access to the firearms was proper, it was permissible to
seize them pursuant to the plain view doctrine.  "[I]n the context of narcotics investigations and
prosecutions, firearms and ammunition are recognized as a tool of the drug trade and constitute
evidence linked with criminal activity. . . .  Thus, when the Government permissibly searched for
drugs or drug paraphernalia under the mattress and saw the firearm and ammunition in plain
view, this was not an illegal search and seizure."  United States v. Houston, 2013 WL 149653, *1
(E.D.N.Y. 2013); United States v. Hayes,  2016 WL 4435203, *1 (W.D.N.Y. 2016) (Arcara, J.)
("[u]pon probable cause to believe the firearm was evidence of the marijuana trafficking that
supported issuance of the search warrant, the firearm need not have been described with
particularity in the search warrant to have been lawfully seized"). Therefore, I recommend that
this motion be denied, without a hearing.

### 3.    Motion to Suppress Evidence Seized from Defendant's Vehicle

Defendant moves to suppress the evidence seized from his vehicle, a 2011
Lincoln MKX, which he alleges was impermissibly subjected to a warrantless search on
September 5, 2014.  Blotnik Affirmation [17], ¶¶25-28; [25], Humann Affirmation [25], ¶¶25-
27.   The government stated at the May 2, 2017 proceeding that irrespective of whether the items
from the vehicle were lawfully seized, it will only use that evidence on cross-examination for
impeachment purposes, but not as part of its case-in-chief.  Defendant acknowledges that

"illegally seized evidence maybe (*sic*) used for impeachment".   Defendant's Post Hearing

Memorandum [133], p. 28.  Based upon that acknowledgment and the government's

representation that it will only use the evidence for impeachment purposes, I recommend that

this motion be denied as moot.  *See* United States v. Atherton, 936 F.2d 728, 734 (2d Cir. 1991)

("suppressed evidence may be used to impeach the testimony of a defendant elicited on proper

cross-examination"); James v. Goord, 2004 WL 1207906, *10 (S.D.N.Y. 2004) ("[t]he

prosecution's opportunity to impeach the defendant's credibility once he has taken the stand

includes the opportunity to use evidence that it was barred from using on its direct case").[12]


        **4.**        **Motion to Enforce the Proffer Agreement**

        Defendant states that a proffer session with law enforcement occurred on

November 13, 2014, but notwithstanding giving "truthful and valuable information" during that

session, he "understands that he will not receive any further 5k[13] benefits and believes that is

unjust and unfair and seeks a hearing on that issue".  Humann Affirmation [31], ¶¶13-14.[14]  The

government responds that defendant did not provide truthful information during the proffer

session, but that in any event the Proffer Agreement [32-1] entered into between the parties did

---

[12]      At the May 2, 2017 proceeding defendant's counsel also challenged the ability of the government to use evidence seized from the vehicle in a related forfeiture proceeding.  However, as I stated at that time, that issue should be addressed in the forfeiture proceeding.  *See* United States v. $10,160.00 in U.S. Currency, 2012 WL 3608578, *4 (D. Conn. 2012) ("the suppression of evidence in the criminal context does not necessarily bear on the authority to seize property in the civil forfeiture context").

[13]      Defendant is referencing the downward departure under §5K1.1 of the United States Sentencing Guidelines.

[14]      It is unclear whether defendant is seeking suppression of the statements he made during the session, to bind the government to a particular sentencing position, or some other form of relief.

not include any sentencing benefit, which is in the sole discretion of the court at the time of sentencing. Government's Response [32], pp. 2-3.

The Proffer Agreement, which was signed by the defendant and his former counsel, does not include any agreement concerning sentencing. In fact, it expressly states that defendant "acknowledges that the government has made no promises or commitments of any kind to [him] regarding the . . . sentence in this . . . case". [32-1], p. 2 of 4, ¶3. *See also* ¶2 ("the government has sole discretion . . . in deciding what benefit, if any, should be afforded to the witness in return for th[e] information and tangible objects provided by the witness"). "Generally speaking, in the absence of a specific agreement, the decision by the prosecutor to forego a downward departure motion in a particular case is not subject to judicial review at all." United States v. Rexach, 896 F.2d 710, 713 (2d Cir. 1990). Therefore, I recommend that this motion be denied, without a hearing.


**5.    Motion to Suppress the Informant's Identification**

Defendant seeks to suppress the identification made by the CS, since it was "inherently and unnecessarily suggestive". Addelman Affirmation [93], ¶4. In response, the government represents that "does not intend to offer the Informant's testimony at trial in its case in chief". Government's Response [95], p. 1. Based on the government's representation, this motion is denied as moot.

6.     **Motion for Production of Discovery**

Apart from the government's <u>Brady</u>,[15] <u>Giglio</u>,[16] and Jencks Act (18 U.S.C. §3500) obligations, Fed. R. Crim. P. ("Rule") 16 is "the sole authorized vehicle under the Federal Rules of Criminal Procedure for pre-trial discovery in criminal cases".  <u>United States v. Louis</u>, 2005 WL 180885, *2 (S.D.N.Y. 2005).  Defendant moves for discovery pursuant to Rule 16, including his written or recorded statements, prior criminal record, tangible objects that the government intends to use at trial or are material to the defense, and physical examinations, mental examinations and scientific reports or tests upon which such reports are based. Blotnik Affirmation [17], ¶¶3(a)(1)(a)-(d); Humann Affirmation [25], ¶¶3(a)-(d).   In response, the government states that it has made or will make these disclosures "and will continue to provide any discoverable materials in conformity with Rule 16 and the defense request".   Government's Response [33], pp. 3-4.

In response to the government's representations, defendant fails to point to any specific deficiency in the government's production.   Based on the record currently before me, I have no reason to question the government's uncontested representations.  *See* <u>United States v. Upton</u>, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) ("[t]o the extent that the government represents that it 'has produced every document in its possession which relates in any way to this case' . . . the court must assume the veracity of that representation. The alternative to such an assumption would require the court to examine numerous file drawers of documents to verify that representation which is as obviously undesirable as it is impractical"); <u>United States v. Johns</u>,

---

[15]     <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[16]     <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

336 F.Supp.2d 411, 424 (M.D.Pa. 2004) ("[t]he court is entitled to rely on the representations of counsel, as officers of the court").

Defendant also seeks expert disclosures pursuant to Rule 16(a)(1)(G). Blotnik Affirmation [17], ¶13; Humann Affirmation [25], ¶13. The government responds that it will "timely provide CVs" and "summaries of anticipated expert testimony in accordance with the standard District Court pre-trial Order". Government's Response [33], p. 4. I conclude that is adequate. Therefore, this motion is denied, without prejudice.

### 7.    Motion for a Bill of Particulars

Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense". United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). "[T]he burden is upon defendants to show that non-disclosure of the requested particulars would lead to prejudicial surprise at trial or would adversely affect defendants' rights". United States v. Duarte, 2014 WL 29366, *1 (W.D.N.Y. 2014).

"In deciding a motion for a bill of particulars, the important question is whether the information sought is necessary, not whether it is helpful." United States v. Conley, 2002 WL 252766, *4 (S.D.N.Y. 2002). A bill of particulars "should not function to disclose evidence,

witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense". United States v. Henry, 861 F.Supp. 1190, 1197 (S.D.N.Y. 1994).

The court "has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form". United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998). See United States v. Messina, 2012 WL 463973, *10 (E.D.N.Y. 2012) ("In determining whether a defendant has shown such necessity, the trial court must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery"). "Whether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

Defendant seeks the identity of each individual identified in the Indictment as "known" co-conspirators by the grand jury. Blotnik Affirmation [17], ¶7; Humann Affirmation [25], ¶7. However, as the government notes, defendant is not charged with any conspiracy. Government's Response [33], ¶5.

Defendant also seeks "[w]hat, if any, evidence seized by the Government constitutes an illegal substance and its total weight". Blotnik Affirmation [17], ¶7; Humann Affirmation [25], ¶7. In its response to defendant's motion, the government states in its recitation of facts states that "two bags of powder (one of which was laboratory-tested to contain over 67 grams of heroin), 91 glassine envelopes of powder (one of which was laboratory-tested to contain an aggregate 29.13 grams of cocaine base), various drug paraphernalia, and other contraband" were recovered during their search of 335 Hewitt Avenue. Government's Response [33], p. 2. "While not in the form of a bill of particulars, I deem the government's recitation of facts to constitute a bill of particulars." United States v. Vendetti, 2013 WL 5522860, *13

(W.D.N.Y.), <u>adopted</u>, 2013 WL 5522434 (W.D.N.Y. 2013) (Arcara, J.). *See* <u>United States v.</u>

<u>Makki</u>, 2007 WL 781821, *6 (E.D.Mich.2007) ("[a]lthough this list [attached to the

government's response to the defendant's motion] is not in the form of a Bill of Particulars, the

Court can deem such exhibits to be a Bill of Particulars"). Therefore, this motion is denied,

without prejudice.


        **8.**     **Motion for <u>Brady</u>/<u>Giglio</u>[17] Material**

        Defendant moves for immediate disclosure of <u>Brady</u>/<u>Giglio</u> materials, including

disclosure of sentencing guideline information. Blotnik Affirmation [17], ¶¶4, 14-16; Humann

Affirmation [25], ¶4. The government acknowledges its continuing duty under <u>Brady</u> "to

produce such material, if and when it is aware of it". Government's Response [33], p. 15, ¶F.

However, it argues that "[t]he <u>Brady</u> doctrine does not cover many of the requests made by the

defendant". <u>Id</u>., p. 16. In reply, defendant does not identify any specific request that he believes

falls within <u>Brady</u>, but has not been produced. With respect to <u>Brady</u> impeachment material, the

government agrees to produce such material "in accordance with the schedule set by the District

Court prior to trial and no later than when the government produces and delivers the Jencks Act

material". <u>Id</u>., p. 17.

        "The government's obligations under <u>Brady</u> . . . are seemingly well-established.

The prosecution has a constitutional duty to disclose evidence favorable to an accused when such

evidence is material to guilt or punishment . . . . This duty covers not only exculpatory material,

but also information that could be used to impeach a key government witness." <u>United States v.</u>

<u>Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001) (*citing* <u>Giglio</u>, 405 U.S. at 154). "[A]s a general rule,

---

[17]    <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant". Id. at 146. "[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." Id. at 144. "[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case". Id. at 146.

Based upon the government's representations, defendant's motion is denied. Consistent with Coppa, the government shall timely disclose Brady and Giglio materials to defendant. See United States v. Hill, 2012 WL 912948, *5 (W.D.N.Y. 2012).

### 9. Motion for Disclosures Pursuant to Fed. R. Evid. 403, 404(b), and 609

Defendant moves for an "advance ruling pursuant to [Fed. R. Evid.] 403, 404(b), and 609, prohibiting the Government's use of prior convictions or proof of the prior commissions of other crimes, wrongs, or acts, either in its direct case or to impeach the Defendant". Blotnik Affirmation [17], ¶10; Humann Affirmation [25], ¶10. The issue of admissibility of such evidence "is best left to the determination of the trial judge at the time of trial". United States v. Hill, 2012 WL 1144541, *6 (W.D.N.Y. 2012). Therefore, this portion of the motion is denied, without prejudice to renewal before the trial judge.

Defendant also seeks also to compel the government to produce all Fed. R. Evid. 404(b) material. Blotnik Affirmation [17], ¶12; Humann Affirmation [25], ¶12. In response, the government argues that "the defendant has not advanced any concrete reason for early disclosure of Rule 404(b) evidence", but it "has nonetheless disclosed this type of evidence at the defendant's request to streamline trial preparations and the disposition of his pre-trial motions"

and "will continue to disclose evidence in its possession which might fall within the ambit of Rule[ ] 404(b) . . .  and will provide notice of its intention to rely upon such evidence at the time it is ordered to do so by the trial court." Government's Response [33], p. 14.

The government must "provide reasonable notice of the general nature of any such evidence the prosecutor intends to offer at trial". Fed. R. Evid. 404(b)(2)(A).   "Insofar as the government has indicated that it intends to comply with any pretrial disclosure order entered by the trial judge and further, that it understands its disclosure obligations, defendant's request is denied as moot."  United States v. Adjei, 2010 WL 2640528, *9 (W.D.N.Y. 2010).

### 10.     Motion for Search of Personnel Files of Government Agent Witnesses

Defendant seeks an order compelling the government "to search the personnel files and records of any Government agent or police witness in this case to determine whether there exists Brady or Giglio materials disclosed to the defense".  Blotnik Affirmation [17], ¶33; Humann Affirmation [25], ¶33. Since the government does not specifically oppose this motion, it is granted.

### 11.     Motion for Identification of Informants

Defendant seeks the disclosure of the identity of any and all informants, each of whom he alleges is a material witness.  Blotnik Affirmation [17], ¶¶38-49; Humann Affirmation [25], ¶¶38-49. The government responds that "[t]he existing indictment only charges the defendant for contraband discovered during and stemming from the execution of the search warrant on September 5, 2014. The informant's involvement, as alluded to in the search warrant application, can hardly make the informant a key witness to the crimes charged. Therefore, the

defendant has no need to learn the informant's identity or file." Government's Response [33], p. 7, ¶C. It also argues that "given the drug-related nature of this case, the government's interest in protecting the confidential informants' safety certainly outweighs the defendant's generalized and unsupported statement of need to learn the informants' identities". Id.

The government is not required to provide early disclosure of the identities of informants unless "an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause". Roviaro v. United States, 353 U.S. 53, 60–61 (1957). "The defendant bears the burden of showing the need for disclosure of an informant's identity . . . and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." United States v. Fields, 113 F.3d 313, 324 (2d Cir. 1997).

"The defendant is generally able to establish a right to disclosure where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." United States v. Saa, 859 F.2d 1067, 1073 (2d Cir.1988). Disclosure is not required if a defendant fails to show that "the testimony of the informant would . . . [be] of even marginal value to the defendant's case". Id. "Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden; instead, the district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity." Fields, 113 F.3d at 324.

From the government's response, it appears that the sole informant in this case was the CS, who provided *in camera* testimony in support of the search warrant. The government has stated that it does not intend to have that individual testify in its case-in-chief. Government's Response [95], p. 1. In my March 21, 2016 Report, Recommendation and Order

-29-

[65] I previously denied defendant's motion for production of certain redacted portions of the CS's testimony that could be used by defendant to identify that individual (or at least significantly narrow the slate of possible individuals).   Id., pp. 6-7.  I still see no reason to disclose the identity of the CS to defendant.

Even if the CS was a participant in or witness to the crimes charged, defendant has not demonstrated that the CS's testimony is material to determining his guilt or innocence. Compare with DiBlasio v. Keane, 932 F.2d 1038, 1043 (2d Cir. 1991) (disclosure required where the defendant introduced evidence that, if credited, would establish an entrapment defense and where the informant was only witness who could corroborate that defense).  Defendant "is not being prosecuted on the basis of any secret evidence. The indictment indicates the amount of heroin and the type of firearm that he allegedly possessed. To convict [defendant] of these charges, the Government will need to introduce evidence in open court that [defendant] possessed the narcotics with the intent to distribute them and possessed the firearm in furtherance of a drug trafficking crime, and before trial the Government will have to provide [defendant] with access to that evidence. At trial, [defendant] will be free to cross examine any witnesses and object to the admission of any evidence. But at the present stage of the proceedings, the materiality to [the] defense of . . . the identity of the informant is low and the Government's interest in protecting the identity of its informant is high." United States v. Saltares, 301 F. Supp. 2d 305, 307 (S.D.N.Y. 2004). See United States v. Caceres, 2010 WL 5419037, *2 (W.D.N.Y. 2010) ("[m]aking the balance of the public's interest in protecting the flow of information against the individual defendant's right to prepare a defense . . .  defendant's motion to compel identification of these informants is denied so long as the Government continues with its intention not to call any of them as a witness at trial").  Without more, the need for disclosure of

the CS's identity has not been established.  *See* <u>United States v. Boone</u>, 2003 WL 841088, *6

(S.D.N.Y. 2003) ("[m]ere speculation . . . that the informer may possibly be of some assistance

does not overcome the strong public interest in protecting informants").  Therefore, this motion

is denied.


       **12.**      **Motion to Preserve Evidence**

          Defendant seeks an order directing the government to preserve evidence.  Blotnik

Affirmation [17], ¶¶50, 52, 55, Humann Affirmation [25], ¶¶50-52.  In response, the government

states that it "has no objection to the request that the government agents retain notes taken during

the investigation of this case".  Government's Response [33], p. 18, ¶H.  This motion is granted.

"The government is directed to preserve all rough notes and items of evidence."  <u>United States v.</u>

<u>Coates</u>, 2013 WL 3897484, *5 (W.D.N.Y. 2013).


       **13.**      **Motion for Disclosures Pursuant to Fed. R. Evid. 807**

          Defendant seeks immediate notification of the government's intention to offer any

statements covered by the residual hearsay exception pursuant of Fed. R. Evid. 807. Blotnik

Affirmation [17], ¶¶53-54 and Wherefore Clause; Humann Affirmation [25], ¶53.  Fed. R. Evid.

807(b) provides that statements covered by the residual hearsay exception are "admissible only

if, before the trial . . . the proponent gives an adverse party reasonable notice of the intent to offer

the statement and its particulars, including the declarant's name and address, so that the party has

a fair opportunity to meet it".  The government does not respond to this motion.  Therefore, it is

granted, and the government shall comply with its obligations pursuant to Fed. R. Evid. 807(b).

### 14.    Motion for Leave to File Additional Motions

Defendant reserves his right to file additional motions.  Blotnik Affirmation [17],
Wherefore Clause.  That  motion is denied, without prejudice to the possibility of additional
motions in the future, upon a showing of good cause for why they were not timely asserted.  *See*
Rule 12(c)(3).

### 15.    Motion for Leave to Supplement the Existing Motions

Defendant had successive opportunities with his first three attorneys to file
pretrial motions.  Upon the appointment of defendant's current fourth counsel, I set a Fourth
Amended Scheduling Order [87] permitting defendant to file any supplemental pretrial motions.
Id., ¶1.  However, instead of supplementing his motions by that deadline, he moved for leave to
do so. Addelman Affirmation [93], ¶3. Defendant having failed to file any supplemental motions
by that deadline or to demonstrate any cause for why was unable to do so, and having had three
prior opportunities to file pretrial motions, this motion is denied.

### B.    Government's Cross-Motion for Reciprocal Discovery

The government cross-moves for reciprocal discovery pursuant to Rule 16(b),
including reports of examinations and tests.  Government's Response [33], p. 19, ¶J.
Additionally, it seeks a summary of any testimony that the defendant intends to use under Fed.
R. Evid. 702, 703, or 705 at trial. Id.  Since defendant does not oppose this motion, it is granted.

## CONCLUSION

For these reasons, I recommend that the following motions by defendant be

denied:                    .

- to suppress his September 5, 2014 statements. Blotnik Affirmation [17],

¶¶29-32; Humann Affirmation [25], ¶¶29-32;

- to suppress evidence from the search of  335 Hewitt Avenue. Blotnik

Affirmation [17], ¶¶17-24; Humann Affirmations [25], ¶¶17-24; [31], ¶¶2-12; Cantwell

Affirmation [53], ¶2;

- to suppress evidence seized from his vehicle.  Blotnik Affirmation [17],

¶¶25-28; Humann Affirmation [25], ¶¶25-27;

- to enforce the Proffer Agreement.  Humann Affirmation [31], ¶¶13-14;

and

- to suppress the CS's identification.  Addelman Affirmation [93], ¶4.

I further order that:

- defendant's motion for evidentiary rulings [123] is denied as moot;

- defendant's motion for leave to supplement ([93], ¶1) is denied;

- the remaining portions of defendant's other pretrial motions [17, 25, 53]

are granted in part and denied in part as set forth above; and

- the government's cross-motion for reciprocal discovery (government's

Response [33], p. 19, ¶J) is granted.

Unless otherwise ordered by Judge Arcara, any objections to this Report,

Recommendation and Order must be filed with the clerk of this court by September 12, 2017.

Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to

object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v.</u>
<u>Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,
case law and/or evidentiary material which could have been, but were not, presented to the
magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal</u>
<u>Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local
Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of
the proposed findings and recommendations to which objection is made and the basis for each
objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the
objections must include "a written statement either certifying that the objections do not raise new
legal/factual arguments, or  identifying the new arguments and explaining why they were not
raised to the Magistrate Judge".  Failure to comply with these provisions may result in the
district judge's refusal to consider the objection.

Dated:  August 29, 2017

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
 United States Magistrate Judge